## Tower Estate

*Lewis H. Van Dusen, Jr., Thomas Reath* and *Drinker, Biddle & Reath,* for exceptants.

*John R. Suria, William H. S. Wells* and *Saul, Ewing, Remick & Saul,* and *Philip Klein,* guardian and trustee ad litem, contra.

LEFEVER, J., March 20, 1962.—Where testator, who died in 1889, designated the beneficiaries of the income and principal of his trust estate by the terms "children", "grandchildren", "issue" and "lineal descendants", and stated that the designated beneficiaries were to take their shares of income "in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent", do the two petitioners who were adopted by a deceased grandchild in 1941 share the income with two natural children of the same grandchild? This is the question presented by this petition to review the adjudication filed by the undersigned on April 1, 1960, and schedule of distribution filed pursuant thereto and approved December 22, 1960.

Testator died July 24, 1889, leaving a will, dated May 21, 1889, which was duly probated on July 31,

1889. By the terms of his will, testator provided, inter alia:

"ITEM 4. I have living at the date of this my Will ten lineal descendants; that is to say, five children and five grandchildren." [He then named the five children and five grandchildren].

"ITEM 5. All the rest, residue and remainder of all my Property and Estate whatsoever and wheresoever, Real, Personal or Mixed, I give devise and bequest unto . . . [trustees, in trust for my wife and children] . . . At and after the decease of each of my said five children, severally and successively, his or her share of the income from my Residuary Estate, as above designated shall be appropriated and divided among the children and issue of deceased children of each one of my children as he or she may successively die, in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent, and in like manner the share of income which may accrue to any of grandchildren or more remote lineal descendants under this my Will and who may die before the period appointed for the distribution of the principal of my Residuary Estate shall in like manner accrue to their children and issue of deceased children as above provided, and such payment or application of the income of a deceased child's or grandchild's share among his or her children and issue shall continue until the arrival of the period for division of the capital of my Residuary Estate, and if any one or more of my children or grandchildren shall die without leaving any issue to survive him or her, then the share of income theretofore appointed and payable to such decedent shall go to the other of my children or grandchildren, (as the case may be), then living and the issue of any others of my said children or grandchildren who may then be

deceased, in the same way and manner in all respects as are limited and provided in respect to their original shares which shall simply be augmented thereby but in all respects covered by the same provisions as applied to their original shares, PROVIDED always, however, that I authorize and empower each one of my children or grandchildren who may leave a husband or wife surviving him or her, by his or her Last Will and Testament, or any writing in the nature thereof by him or her signed, to make provision for any surviving husband or wife either of them may leave surviving, to continue during the life but not to exceed one-fourth of the income which would have been payable to such testator or appointer if he or she had remained living ... I direct the division of all the capital of my Residuary Estate among all my lineal descendants then living, to each an equal fractional share, thereof without regard to their stock or the degree of their descent from me ... "

"ITEM 12. If I have not already sufficiently declared my intention in respect thereto, I do now declare that ... each and all of the beneficiaries who may die leaving issue such issue shall succeed to the share which the decedent would have taken if living, and if more than one, in equal shares ... "

After the death of testator's wife, income was paid in equal share to his five named children for their respective lives, and thereafter to his grandchildren for their lives, in accordance with the terms of the will.

The share of income here involved is that of testator's grandson, Geoffrey Tower, who died March 26, 1957, survived (a) by his wife, who thereafter died December 4, 1959; (b) by two natural children, Charlemagne Tower, 4th, and Helen Tower Brunet; and (c) by petitioners, Annette Tower Earl and Tripp Tower, who were adopted by Geoffrey Tower in 1941.

By the adjudication, the two natural children take the grandson's share of the income. However, accountant did not know of the existence of the two adopted children and, therefore, did not notify them of the audit. Their rights, if any, were not considered by the auditing judge.

Do the adopted children of Geoffrey Tower have any rights?

Testator was an astute, wealthy business man. His will was clearly and carefully drawn. He left no detail to chance. He set up a trust to pay the income so long as permitted under the rule against perpetuities, on a *per stirpital* basis, and at the expiration of this period to divide the corpus *per capita* "among all my lineal descendants then living."

Testator made constant reference throughout his will to members of his blood, i.e., "children", "grandchildren", "issue" and "lineal descendents". The sole exceptions to "blood" relatives were his own wife and the surviving spouses of children and grandchildren, to whom he carefully and precisely authorized his children and grandchildren to appoint to the limit of one fourth of their respective shares of income. It is clear, therefore, that testator knew how to provide for blood relatives and for strangers to the blood; and that if he wished to include "adopted children" of a grandchild, he could have, and would have, expressly said so. Testator's intention, affirmative or negative, governs. Nothing in the will shows an intention to include the petitioners.

Adopted children's rights of inheritance are determined by the statutes of inheritance in force at the time the inheritance became effective, and, when there is a will, by the terms of the will itself: Storb Appeal, 400 Pa. 567, 572. The meaning of the words used by testator must be determined from the context of the

will and the law in force in 1889 when the will became effective: Collins Estate, 393 Pa. 195, 200. The canons of construction also require this: Bigony Estate, 397 Pa. 102. There it was stated, at page 104:

"The controlling element in the construction of every will is of course the intention of the testatrix. Mulert Estate, 360 Pa. 356, 61 A. 2d 841. This intent must be ascertained by a consideration of the *entire* will which is to be read in the light of the surrounding circumstances at the time it was written. March Estate, 357 Pa. 216, 53 A. 2d 606. Since there is no uncertainty or ambiguity in the will, the meaning must be ascertained from the language therein. It is not what this Court thinks she might or would have said, or even what the Court thinks she meant to say, but what is the clear meaning of her words ..."

Testator, in most uncommon manner, enumerated his children and grandchildren by name in item 4 of his will. Testator then provided that during their lives his children were to receive income. He then specified that the share of income of a child who died was to be "divided among the children and issue of deceased children" of such child "in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent." He made similar provision for his grandchildren and more remote lineal descendants. This amounted to a per stirpital gift. Testator first defined the class: "children", "grandchildren", "issue" and "lineal descendants", all terms of blood relationship. He then used the intestate act to define and measure the share of each. This is a far cry from "a gift to those entitled under the intestate act." It is not a dispositive provision, but a means of defining or measuring what share each member of the class should receive. Clearly, testator did not leave to the intestate act "who is to take".

" 'Issue' means issue of the body, offspring, progeny, natural children, physically *born* or *begotten* by the person named as parent . . . An adopted child is issue of his natural parents and not of his adopted ones": Howlett Estate, 366 Pa. 293. " . . . Issue strongly connotes the blood relationship which arises solely by actual birth of the child to the parent": Collins Estate, 393 Pa. 195. Of course, prior to the Estates Act of 1947 it was settled that "issue" did not include an adopted child: Howlett Estate, supra.

In Kohler's Estate, 199 Pa. 455, relied upon by petitioners, testator died in 1868. He gave part of his estate in trust for his son for life with remainder to " 'such person or persons as would be entitled thereto if my said son . . . died intestate, and possessed thereof and in such shares and proportions as such person or persons would in such case be entitled by law.' " The son died in 1900, survived by an adopted daughter, adopted after testator's death. The remainder was held to pass to her. The court, speaking per Mr. Justice Mitchell, stated at page 457:

" 'The will of John Kohler . . . was written thirty-six years before the decree of adoption, and that event therefore was not reasonably within the contemplation of the testator. But as he gave the estate to those persons to whom the law would give it in the case of intestacy, he cannot be said to have had any particular class of heirs or next of kin in view, and he committed the question of determining who would take to the law itself.' "

Johnson's Appeal, 88 Pa. 346, involved a factual situation very similar to Kohler's Estate, supra, and the language of the will was almost identical. Holding the adopted child to be entitled to the remainder, the court said at page 353:

"In all this the intent of testatrix is unmistakable: her main object is to provide for her son for life; . . .

After he is gone, her chief intent is fulfilled, and she casts the remainder over to the disposition of the intestate laws, to go not to any particular class, stalk or stirp, and not to her blood, near or remote, but to such *person* or *persons* as would . . . be entitled to the same, had Samuel B. Johnson died intestate and seised thereof in fee.

" . . . She is careful to use no word by which the operation of the intestate laws might be limited . . . "

In the instant case, there is no such dispositive language. As stated supra, testator merely used the intestate act to determine the shares of his predefined classes; "children", "grandchildren", "issue" and "lineal descendants". Hence these cases are not apposite.

Johnson's Appeal and Kohler's Appeal, supra, establish the principle that where the gift in remainder is to such persons as would be entitled to take from the life tenant under the intestate laws, an adopted child constitutes an heir under the provisions of the Adoption Act of May 4, 1855, P. L. 430; and Collins Estate, supra, permits an adopted child to take under a gift to "descendants", where the law in effect at the decedent's death permits and the other provisions of the will are consonant therewith.

The will of testator in the instant case gave the income from the trust, at the death of each of testator's children "among the children and issue of deceased children of each one of my children as he or she may successively die, in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent . . . " The gift was not to such persons as would be entitled to take under the intestate laws had such child died intestate, as was the case in Johnson's Appeal and Kohler's Estate, supra. The intestate laws were referred to as the yardstick for measuring the shares of

income to be divided "among the children and issue of deceased children of each one of my children ... "

The same analysis and interpretation applies to the next succeeding provision, that is, "... and in like manner the share of income which may accrue to any of my grandchildren or more remote lineal descendants under this my Will and who may die before the period appointed for the distribution of the principal of my residuary estate shall in like manner" (i.e., in the "shares and proportions they would take in distribution under the intestate laws of Pennsylvania"). Here, again, the provisions of the intestate laws were used as the measure for determining the shares or proportions of income which more remote takers were to receive, and *not* as the basis for determining the *identity* of the takers. Their identity was established by the phrase "my grandchildren *or* more remote lineal descendants under my Will ... "

The phrase "lineal descent" designates a descent from father to son, or grandfather to grandson, etc.: 26A C.J.S. 511. This is the meaning testator ascribed to it in the phrase quoted above, and further emphasized by the next succeeding provision, which stated: " ... and such payment or application of the income of a deceased *child's or grandchild's share among his or her children and issue* shall continue until the arrival of the period for division of the capital of my said Residuary Estate ... "

Webster's New International Dictionary, 2d Ed., defines "lineal" as (1) of or pertaining to a line or lines; measured on, or ascertained by, a line ...; (3) consisting of, or being in, direct line of ancestry or descendants;—opposed to collateral; as, a lineal descent; a lineal descendant; his lineal ancestors; (4) relating to, or derived from, ancestors in the direct line ... ; (5) descended in a direct line; in the line of succession through lineage.

Testator provided for the distribution of principal upon the termination of the trusts "at the expiration of twenty-one years from and after the death of the last survivor of my children and grandchildren who may be *born* in my lifetime . . ." If testator had in mind adopted persons, he would, or should, have said "who may be *born* or *adopted* . . ." However, he did not say so. Moreover, testator directed that the remainder be divided among all of his "lineal descendants then living, to each an equal fractional share thereof without regard to their stock or the degree of descent from me". As noted above, testator specifically described his lineal descendants as his children and his grandchildren. If these two points form a straight line, an extension of that line must include only great-grandchildren, great-great-grandchildren, etc., of the blood. To include adopted children of a grandchild within the term "lineal descendants" (which testator has so clearly defined), would require a variance of the straight line which testator drew between the two essential points which he fixed, namely, children and grandchildren (and more remote lineal descendants). Furthermore, by his use, interchangeably, of "issue" and "lineal descendants" testator closed the door to strangers to his blood.

Finally, in item 12, testator re-emphasizes that only those of his direct blood line are to enjoy his estate: "If I have not already sufficiently declared my intention in respect thereto, I do now declare that . . . each and all of the *beneficiaries* who may die leaving *issue* such *issue* shall succeed to the share which the decedent would have taken if living, and if more than one, in equal shares . . ." (Italics supplied).

Prior to the Wills Act of June 7, 1917, P. L. 403, 20 PS §228, adopted children could not participate in testamentary gifts to "children". "Children" did not include adopted children: Corr's Estate, 338 Pa. 337;

Hughes' Estate, 225 Pa. 79. And under the Act of 1917, a child adopted after the execution of a will was excluded: Holton Estate, 399 Pa. 241. Gifts to "issue" were limited to "lineal descendants" of a deceased child of testator to the exclusion of children by adoption: Ashhurst's Estate, 133 Pa. Superior Ct. 526. In that case, testator died in 1900 leaving a will by which income was to be paid (after the death of his wife) to his children, or the issue of any deceased child of his. In denying the claim of a subsequently adopted grandchild, the court said at pages 529 to 530:

". . . Issue in a will means prima facie 'heirs of the body': Taylor v. Taylor, 63 Pa. 481. 'The word issue, in legal parlance, means *lineal descendants*, irrespective of their being of the same generation. In our several Acts of Assembly regulating the descent and distribution of real and personal estates of intestates, the words 'issue' and 'lawful issue' have always been employed as synonymous with lineal descendants, including not only the first, but more remote generations as well: Wistar v. Scott, 105 Pa. 200, 215. It is synonomous with offspring: Allen v. Markle, 36 Pa. 117.

". . . whatever change the Wills Act of 1917 may make on the construction of wills made or proved after its date, neither of them [Wills Act or Intestate Act] can change the distribution of his estate prescribed by a testator in his will, made and proved seventeen years before; nor will the Act of April 4, 1925, relating to Adoption, passed twenty-five years after the will was proved, affect its provisions. The will will be interpreted and applied in the light of the law as it was when it was admitted to probate. We are satisfied that so applied the word 'issue' did not include an adopted child."

Petitioners rely strongly upon Collins Estate, supra. In that case, testatrix died in 1921, survived by three natural children (the last of whom died in 1957), and

two children adopted after testatrix' death. Testatrix referred to five classes of takers: "children", "grandchildren", "descendants", "next of kin", and *heirs and next of kin to be determined by the intestate laws of Pennsylvania."*

In short, testatrix left the determination of the final taker to the intestate laws. Moreover, a general power of appointment was given to the surviving child in default of issue or descendants or collaterals. This power manifested a second surrender of the power of testatrix to designate takers. The court found that testatrix did not intend to equate "issue" and "descendants"; that she committed to the intestate law *who* was to take as well as in *what proportions* they were to take; that she manifested no intention to restrict her bounty to blood lines, because she committed distribution to those to be determined by law and because she gave a general power of appointment; and finally that these manifestations of intention became effective in 1921 when an adopted child was equated with a natural child as a member of the family.

However, Holton Estate, 399 Pa. 241, clarifies and distinguishes Collins Estate. The opinion by Mr. Justice Benjamin R. Jones, the opinion writer in Collins Estate, supra, contains language which distinguishes the principle established in Collins Estate, supra, viz., (page 245):

". . . The appellants argue that in the eleventh paragraph when the testator used the word 'descendants' in juxtaposition with the words 'child' and 'children' he used such words synonymously, and, since we held in Collins Estate, 393 Pa. 195, 142 A. 2d 178, that the word 'descendants' may include adopted children, Collins should control and the words 'child' or 'children' likewise be held inclusive of an adopted child or children. From a study of the language of this will it is apparent that Collins is wholly inap-

posite. Testator did not use 'descendants' synonymously with 'child' or 'children'; it is clear that the testator's reference to 'child' or 'children' was to members of a third generation class while his reference to 'descendants' was to members of a fourth generation class . . . the court below aptly stated: '. . . it is clear that the only rights of [the adopted children] are as *children or descendants of deceased children* of [Howard Holton]. They cannot by implication elevate themselves into a broader class described as 'descendants' . . ."

The provision of the present will is that "payment or application of the income of a deceased *child's* or *grandchild's share among his or her children and issue* shall continue until the arrival of the period for division of the capital. . . ." In Howlett Estate, 366 Pa. 293 (1951), the Supreme Court defined "issue" (at 297), as follows: " 'Issue' is not synonymous with 'children'. 'Issue' means issue of the body, offspring, progeny, natural children, physically born or begotten by the person named as parent: Ashhurst's Estate, 133 Pa. Superior Court 526, 3 A. 2d 218; and see Coble's Estate, 58 D. & C. 632. An adopted child is issue of his natural parents and not of his adopted ones: Russell's Estate, 284 Pa. 164, 130 A. 319; Taylor Estate, 357 Pa. 120, 53 A. 2d 136."

As stated by President Judge Klein of this court in Holton Estate, 15 D. & C. 2d 485, 489:

"A careful study of this decision, however, [Collins Estate] suggests that it must be regarded as sui generis; that the court's conclusion was predicated solely upon its interpretation of the language of the particular will before it for construction. And this is the clear implication of the language of Mr. Justice Benjamin R. Jones, speaking for a unanimous Supreme Court at page 198:

" 'Appellants do not base their claim upon the terms of any statute nor upon contention that the will contains a gift to children, as such, of the life tenants. On the contrary, they claim that by testatrix's use of the word "descendants" in her will she intended to include therein persons to whom property descends under the laws of Pennsylvania and that, as adopted children, they are within that class.'

" 'The determination of this controversy depends upon an interpretation and construction of the fourth paragraph of this will: an evaluation of testatrix's intent as and to the extent such intent may be evident from the language and terms of the instrument.' "

Under the will of testator, "issue" and "lineal descendants" are used synonymously; the restriction to "lineals" attached in each instance to "descendants". *Children* and *issue* of deceased grandchildren are designated by testator as takers and the determination of the beneficiaries is nowhere committed to the laws of Pennsylvania. Only the shares and proportions each named class and person in the class are to take from parents is related to the intestate laws of Pennsylvania. That testator meant issue to succeed to the share of the parent per stirpes is made clear in Item 12. Testator's will manifests a clear intent to benefit only those of his *blood*. This is emphasized by the care with which an exception is made as to spouses; *this exception is clear and precise and not committed to legislation.*

In conclusion, the instant testator's will controls the controversy. His meaning must be determined from his will in light of the law in effect on July 24, 1889. His will begins with words of *blood*, viz., "children", "grandchildren", "issue" and "lineal descendants", and closes with "descent from me", also words of *blood*. It is inescapable that testator, by the language he used,

intended to include only relatives of his blood and to exclude strangers to the blood, as subsequent takers of income on a grandchild's death. Petitioners, therefore, are not entitled to a share.

The auditing judge decides that petitioners, adopted children of Geoffrey Tower, have no rights in testator's estate. Hence, the original adjudication of April 1, 1960, and schedule of distribution filed pursuant thereto (and approved by the auditing judge) were correct. Therefore, petitioners were not "parties in interest" entitled to a review within section 721 of the Fiduciaries Act of 1949.

Accordingly, March 20, 1962, the adjudication of April 1, 1960, as herein supplemented, is reaffirmed, and the account is reconfirmed nisi.

*Opinion sur Exceptions*

BOLGER, J., May 11, 1962.—We have carefully reviewed the record and the opinion of the hearing judge and are unanimously convinced that the conclusion is correct for the reasons he assigns. We entertain no doubt that testator's reference to the intestate laws of Pennsylvania was not expressive of an intention to commit the devolution of any part of the income of his estate completely to that law, but is a clear declaration that it was solely for the purpose of ascertaining the extent of "the shares and proportions" of "the children and issue of deceased children . . . and in like manner the share of income which may accrue to any of my grandchildren or more remote lineal descendants . . ." that *such persons* should take per stirpes.

To arrive at the construction proposed by the exceptants, the will would have to be reformed. Not only would the wording of testator have to be tortured, but several vital, specific phrases such as "children and issue of deceased children" and all other similar ones

appearing throughout the will, all of which are referred to in the adjudication, would have to be completely deleted from the will. We would have to substitute for all of them such phrases as "such person or persons as would be entitled thereto if my son . . . died intestate . . . and in such shares and proportions as would in such case be entitled by law" (Kohler's Estate, 199 Pa. 455). Obviously, this would be egregious error: Wharton Appeal, 373 Pa. 360. The only authority newly advanced by exceptants and, therefore, not commented upon in the adjudication is Frazier v. Oil Chemical Co., Inc., 407 Pa. 78. This case is inapposite.

We are here dealing with the question of whether two children adopted by the grandson, Geoffrey, in 1941 are entitled to participate with two natural children of Geoffrey, who died in 1957, in the income of testator-grandfather's estate, he having died in 1889. Are the adopted children of Geoffrey entitled to share in the grandfather's estate through Geoffrey, their adoptive father?

Exceptants would have us employ the Intestate Act of April 24, 1947, P. L. 80, which was in effect when Geoffrey died. They also point out that if this act is invoked, the hearing judge's award in the adjudication of the entire share of the income of Geoffrey to Geoffrey's two natural children is in error because there were four "children" of Geoffrey, the other two being the exceptants and, therefore, the two natural children should have been awarded only one-half of the share between them, thereby creating an intestacy as to the other one-half share.

Respondents make the point, assuming for the purposes of argument that if testator, who died in 1889, intended to incorporate in his will the law of intestate succession in order to determine *who* should inherit,

he did not intend that a law passed more than a half century after his death should determine that class.

The question raised involves testator's legal intent, viz., what is the impact upon the operation of his will of legal doctrines or statutes existing at the time of the execution of his will or at the time of his death in 1889 or of later-established legal doctrines or statutes? To what intestate law or to what doctrine of law did he refer when he stated in the disputed clause "in the same shares and proportions they would take in distribution under the Intestate Laws of Pennsylvania"? Did he mean the Adoption Act of May 4, 1855, P. L. 430, under which adopted children inherit from their adoptive parent, the Act of April 13, 1887, P. L. 53, amending the Act of 1855, the Intestate Act of June 7, 1917, P. L. 429, or that of 1947? Or, on the other hand, did he rely upon the doctrine of law established in Buzby's Appeal, 61 Pa. 111, decided in 1869 and discussed hereinafter?

The importance of this question is realized when we refer to the history of the adoption statutes and the appellate court decisions interpreting them set forth by Justice Benjamin Jones in Collins Estate, 393 Pa. 195, pp. 201 to 207, in particular the treatment of this subject by former Chief Justice Stern in Cave's Estate, 336 Pa. 358, 362, which Justice Jones describes as "the landmark case". In Cave's Estate, the court held that although adopted children could inherit from their adoptive parent and from the natural children of their adoptive parent under the Adoption Act of 1855 and its amendments, it was not until the passage of the Intestate Act of 1917 (the provisions of which concerning adopted children are continued in the Intestate Act of 1947) that an adopted child could inherit "from" and "through" his adoptive parents. Exceptants must inherit, if at all, "through" Geoffrey, their adoptive father.

This question of what law applies in this situation was fully discussed by this court in Ayres Estate, 11 D. & C. 2d 383. See also Lusk Estate, 354 Pa. 6; Lyman Estate, 366 Pa. 164; Collins Estate (supra) and Troxell's Estate, 90 Pa. Superior Ct. 533. The controlling doctrine involved appears to have originated in Buzby's Appeal, 61 Pa. 111 (1869), 20 years before testator's death. One of the best statements of it is contained in Whiteside's Estate, 302 Pa. 452, 454, cited with approval in Heaton Estate, 404 Pa. 360, 367: ". . . where a testator gives his estate to his heirs or next of kin or to those who may be entitled under the intestate laws, these classes are to be determined as of the date of his death, even though a life estate intervenes,—the only exception to the rule being where the will contains an expression showing a clear and unequivocal intention to the contrary." Applying this doctrine to the instant case, our reading of the disputed phrase convinces us that neither testator nor his attorney could, when this will was executed in 1889 or at the time of testator's death, have anticipated the passage of the Intestate Acts of 1917 or of 1947. On the other hand, there can be no doubt that testator and the scrivener knew of the existence of the above enunciated doctrine of law established in Buzby's Appeal (supra) and of the then existing Intestate Act of 1833 as amended in 1855 and in 1887 and, therefore, assumed that those intestate laws would control the dispositions, if any, under his will. Under those acts, adopted children could not inherit through their adoptive parents. We can find no indication in the will that testator intended that any intestate act subsequent to his death would control the devolution of any part of his estate.

We, therefore, conclude that testator's legal intent accords with his testamentary intent and that the exceptants have no standing to petition for the opening

and review of the adjudication as decided by the hearing judge.

Accordingly, the exceptions are dismissed, the supplemental adjudication dated March 20, 1962, is confirmed absolutely and the awards made in the adjudication of April 1, 1960, are reaffirmed.